# DISTRICT BOARD OF TRUSTEES OF MIAMI-DADE COMMUNITY COLLEGE v KING

## Case No. 85-1353

State of Florida, Division of Administrative Hearings

December 20, 1985

### APPEARANCES OF COUNSEL

**Donald M. Middlebrooks** and **Nancy E. Swerdlow, Steel Hector & Davis,** for petitioner.

**Neil Flaxman, Flaxman and Flaxman, P.A.,** for respondent.

### OPINION

DIANE D. TREMOR, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice, an administrative hearing was held before Diane

■■■■■■■■■
■■■■■

D. Tremor, Hearing Officer with the Division of Administrative Hearings, on August 28,1985, in Miami, Florida. The issue for determination in this proceeding is whether respondent should be dismissed from employment retroactively to the date of his suspension based upon the charge of gross insubordination.

## INTRODUCTION

By a "Petition for Dismissal," the District Board of Trustees of Miami-Dade Community College seeks to discharge respondent retroactively to the date of his suspension on charges of gross insubordination. Factually, it is alleged that respondent willfully and repeatedly refused to talk with and take direction from administrators, failed to attend to his instructional duties and was attending to personal business affairs at a time when he was absent from duty for medical reasons.

In support of its position, the petitioner presented the testimony of Dr. Jeffrey Lukenbill, the Dean of Academic Affairs at petitioner's North Campus; Blanca Gonzalez, the Acting Associate Dean of Occupational Careers; and Dr. J. Terrence Kelly, the Vice President of petitioner's North Campus. Petitioner's Exhibits 2, 7, 8 and 9 were received into evidence.

The respondent James T. King testified in his own behalf and also presented the testimony of Eugene Pitman, a computer laboratory manager, and Rosemary O'Donnell, a student. Respondent's Exhibits 2, 3 and 5 through 10 were received into evidence. The parties' prehearing stipulation was received into evidence as Hearing Officer's Exhibit 1.

Subsequent to the hearing, the parties submitted proposed findings of fact and proposed conclusions of law. These documents have been carefully considered. To the extent that the substance of the parties' proposed findings of fact are not included in this Recommended Order, they are rejected for the reasons stated in the Appendix attached hereto.

## FINDINGS OF FACT

Upon consideration of the oral and documentary evidence adduced at the hearing, as well as the parties' factual stipulations, the following relevant facts are found.

(1) Miami-Dade Community College is a public educational institution operated by the District Board of Trustees. Its North Campus has an enrollment of approximately 14,000 students, and employs approxi-

mately 340 professional faculty and administrators and 300 clerical personnel. At all times relevant to this proceeding, respondent James T. King was employed on an annual contract basis as an instructor in the Division of Occupational Careers, Business Data Processing Department, at the North Campus. As pertinent here, his latest annual contract was for the period from August 1984 to August 2, 1985. That contract has not been renewed and did not create the expectancy of employment beyond August 2, 1985.

(2) As pertinent to this proceeding, the organizational administrative structure of the North Campus, in descending order, is as follows: the President of the College, the Campus Vice-President, the Dean of Academic Affairs, the Associate Deans of the various divisions, the department Chairpersons and instructors. The North Campus Vice-President is the chief administrative officer at that campus and is responsible for providing broad leadership and administrative direction for all of the campus programs and services. The Dean of Academic Affairs is the chief academic officer and is responsible for the faculty and for providing the planning, development, implementation, monitoring, and evaluation of the various instructional divisions.

(3) During the time periods relevant herein, Dr. Lukenbill was the Dean of Academic Affairs and Dr. Kelly was the North Campus Vice-President. Dr. Lukenbill had been employed at the college since 1972 and was appointed as the North Campus Dean of Academic Affairs on January 28, 1985. Dr. Kelly, having served in various levels of college administration for 23 years, was appointed as the North Campus Vice-President during the first week of February, 1985. The Acting Associate Dean of the Division of Occupational Careers was Blanca Gonzalez. Within this Division is the Department of Business Data Processing, chaired by Lincoln Andrews. The respondent King was an instructor in that Department.

(4) From January 30, 1985 through February 17, 1985, respondent was unable to work due to medical reasons. On February 11, 1985, respondent was advised by telegram from the Director of Personnel Services that he would be required to present a physician's statement to the Associate Dean of his Division substantiating that he is physically able to resume his duties. During the period between January 30, 1985 and February 17, 1985, respondent did hand-deliver a letter from himself to the College President on January 30, had one dinner engagement, made two visits to a former faculty member's home and had one faculty member in his home.

(5) February 18 was a school holiday. At approximately 8:00 a.m. on

202

February 19, 1985, respondent returned to the North Campus and reported to Associate Dean Gonzalez' office for the purpose of providing documentation regarding his ability to return to work. With him was Harry Forster, a former faculty member who had been terminated and had been asked not to return to the campus. Respondent presented Ms. Gonzalez with certain documentation from his physician and requested her to sign a receipt for the documents. Ms. Gonzalez signed and returned the documents to the respondent and the conversation between them concluded. At that point, Mr. Forster told Ms. Gonzalez that he wanted to speak with her about the Chairperson of the Business Data Processing Department. Ms. Gonzalez then telephoned Dr. Lukenbill, the Dean of Academic Affairs, and asked him to come to her office to join the meeting because she felt the Academic Dean should be a part of the discussion which Mr. Forster desired to initiate.

(6) Having been recently appointed as Academic Dean, and respondent having been on sick leave since January 30, 1985, Dr. Lukenbill had not met respondent prior to February 19, 1985. As he walked into Ms. Gonzalez' office, he introduced himself to the respondent and shook his hand. A discussion thereafter ensued between Dr. Lukenbill, Mr. Forster and Ms. Gonzalez, with the respondent taking no part in the discussion. The matters discussed by Mr. Forster related to his concerns and beliefs regarding certain activities and personnel at the College. They did not involve the respondent, though both the respondent and other administrators had previously heard the allegations made by Mr. Forster.

(7) At the conclusion of the discussion between Forster, Lukenbill and Gonzalez, Dr. Lukenbill turned to the respondent and stated that he would like to have a few words with him and asked if he had a few moments. His purpose in initiating that discussion was a combination of courtesy, to establish a rapport with a faculty member he had just met, and to assure himself that respondent was physically able to resume his duties as an instructor. It was not unusual for Dr. Lukenbill to speak directly with faculty members, in spite of the organizational chain of administrative command. In response to Dr. Lukenbill's invitation to talk together, respondent produced his attorney's business card and responded that he would not speak with Dr. Lukenbill. Respondent then left Ms. Gonzalez' office with Mr. Forster, and attended his scheduled classes.

(8) For some time prior to February 19, 1985, respondent had been involved in a contract dispute with the College concerning his salary. His retained attorney had written a letter dated February 14, 1985, to President McCabe regarding this matter and had requested a response

**203**

within five days. Respondent was of the impression that he should not speak to college administrators concerning his contract dispute or the Forster allegations in the absence of his attorney.

(9) When Dr. Lukenbill asked to speak with the respondent on the morning of February 19, neither he nor the respondent mentioned respondent's salary or contract dispute with the College. Dr. Lukenbill had no knowledge of the February 14 letter from respondent's attorney to President McCabe. While respondent testified that he would have spoken to Dr. Lukenbill had Dr. Lukenbill advised him that he wished to discuss academic matters with him, the evidence is clear that respondent did not express this to Dr. Lukenbill nor did he inform Dr. Lukenbill that he only did not feel at liberty to discuss his salary dispute or the Forster allegations in the absence of his attorney.

(10) Dr. Lukenbill did not intend to speak with respondent concerning either respondent's contract dispute with the College or the allegations made by Mr. Forster. He had previously heard those allegations and felt that they concerned matters unrelated to the respondent. Dr. Lukenbill was concerned that respondent's refusal to speak with him created a situation where he, as the Dean for Academic Affairs, could not fulfill his responsibilities of managing the assignment of faculty and the conduct of classes. For this reason, he contacted Vice-President Kelly after the February 19 incident and expressed his concern that respondent's refusal to speak with him impaired his ability to carry out his responsibilities. Dr. Kelly was also concerned and puzzled about respondent's refusal to talk with the Dean, and agreed that the situation needed to be immediately resolved.

(11) At approximately 11:00 a.m. on February 19, 1985, Dr. Lukenbill instructed Ms. Gonzalez to deliver a note to respondent requesting him to come to Dr. Kelly's office to meet with Dr. Kelly and Dr. Lukenbill at 11:30 a.m. Ms. Gonzalez had a memorandum prepared and attempted to have it delivered to respondent's lab. The evidence is conflicting as to the time of the attempted delivery and as to the respondent's schedule of classes and/or labs on that particular day and time. Respondent did attend two of his classes on the morning of February 19. In any event, the memorandum of February 19 was not delivered to the respondent.

(12) On the morning of February 20, 1985, Dr. Lukenbill again requested Ms. Gonzalez to prepare and deliver a note to respondent requesting him to meet with Dr. Lukenbill and Dr. Kelly in Dr. Kelly's office at 12:15 p.m. Ms. Gonzalez prepared the memo and attached the similar memo of the previous day. Neither memo stated

the reason or purpose of the scheduled meeting. The February 20 memo and attachment were delivered to the respondent during his scheduled class, and respondent appeared at Dr. Kelly's office at the scheduled time.

(13) Vice-President Kelly had never met respondent prior to February 20, 1985. He was aware that there had been some problems with faculty members missing classes in the respondent's Department and had heard the respondent's name in this regard. His concern, however, on February 20 was to attempt to understand and remedy the respondent's refusal to speak with his Academic Dean on February 19. Dr. Kelly had no knowledge of respondent's contract dispute with the College and perceived no connection between Dr. Forster's allegations and the respondent.

(14) Respondent appeared at the February 20 meeting with Dr. Kelly and Dr. Lukenbill and the three individuals sat at a small conference table. Respondent immediately placed a tape recorder on the table and asked if there were any objections to the meeting being taped. Drs. Kelly and Lukenbill both indicated they had no objection. Respondent turned on the tape recorder, taped some background information and then indicated to the others that they could proceed with the discussion. It is undisputed that the discussion began with Dr. Kelly stating that they wished to speak with the respondent about what occurred on the previous day. What Dr. Kelly was referring to, and what Dr. Lukenbill understood to be the purpose of the meeting, was the respondent's refusal to speak with his Academic Dean on February 19. In response to Dr. Kelly's opening statement, respondent threw his attorney's business card on the conference table and refused to speak to the Vice-President or the Academic Dean. Dr. Kelly explained to the respondent that he considered the respondent's behavior, both then and on the previous day, to be inappropriate, intolerable and a very serious matter. He informed the respondent that if he were not going to speak with Dr. Kelly or Dr. Lukenbill there would be no way respondent could remain on campus and that he would recommend his suspension to the College President. Respondent inquired as to whether Dr. Kelly was ordering him to leave the campus, Dr. Kelly responded that he was requesting him to leave the campus and respondent then left Dr. Kelly's office.

(15) Respondent offers the explanation that, since the notice of the February 20 meeting did not set forth the subject matter or reason for the meeting, he had no way of knowing what Dr. Kelly meant by stating that he wished to discuss what occurred on February 19. This explanation is not credible and does not justify his conduct of refusing

**205**

to speak to his college administrators. First, even if respondent had been instructed by his attorney not to discuss his contract dispute in her absence, there is a conflict in the evidence as to whether respondent's contract or salary dispute was ever mentioned during the February 20 meeting. Dr. Kelly was not even aware of such a dispute. While respondent testified that he himself inquired as to whether the meeting had anything to do with his contract, he further testified that Dr. Kelly responded that he did not want to talk about a contract dispute but instead wanted to talk about what happened with Dr. Lukenbill the previous morning. Thus, even accepting the respondent's versions of the February 20 meeting, it is clear that respondent understood, at some point in time, that the intended purpose of the meeting was to discuss respondent's refusal to speak with Dr. Lukenbill. Respondent never offered any explanation to Dr. Kelly or Dr. Lukenbill as to why he would not speak to them. It is clear that the meeting started and ended with the key administrators of the North Campus expressing their desire to have respondent explain to them and change his position concerning his unprofessional behavior on that day and the previous day. Respondent's own fears or concerns regarding either his contract dispute or the Forster allegations do not excuse his willful and continued failure to communicate with the top two administrators responsible for his employer's functions and operations.

(16) By telegram dated February 20, 1985, Dr. McCabe, petitioner's President, advised respondent that he was suspended without pay pending Dr. McCabe's recommendation for dismissal to the District Board of Trustees. By letter dated March 1, 1985, Dr. McCabe advised respondent that he would recommend respondent's termination at the March 26, 1985, District Board meeting based upon the charge of gross insubordination. At that meeting, the District Board suspended respondent without pay pending the termination proceedings. The Petition and Notice for Dismissal was served on April 2, 1985, and respondent requested a formal hearing.

## CONCLUSIONS OF LAW

The petitioner has the authority to appoint and remove instructional personnel at Miami-Dade Community College. Section 240.319, *Florida Statutes*; Rule 6A-14.247, *Florida Administrative Code*. An annual contract instructional employee, such as the respondent, may be suspended or dismissed during the college year for a charge based upon gross insubordination. Rule 6A-14.411(6), *Florida Administrative Code*. The burden is upon the petitioner in this proceeding to establish that respondent's conduct constituted "gross insubordination," a term not defined by the statutes or rules which govern community colleges.

206

Petitioner essentially alleges three factual bases in support of its charge of gross insubordination. It is alleged that respondent refused the requests and directions of the Dean of Academic Affairs and the Vice-President to speak with them on February 19 and 20, 1985; that he failed to attend to his scheduled instructional duties on February 19; and that, while absent from duty for medical reasons between January 30 and February 19 he was attending to personal business affairs.

The evidence presented in this case does not support the factual allegations that respondent failed to attend to his scheduled instructional duties on February 19 or that he was attending to personal business affairs when he was on leave for sickness. While respondent could not be located by a messenger at approximately 11:05 a.m. to receive a memorandum regarding an 11:30 a.m. meeting, this fact does not establish that he failed to attend to his duties that day. Indeed, the evidence demonstrates that respondent did attend two morning classes on that date and the petitioner failed to demonstrate that his schedule required more. Likewise, the fact that respondent hand-delivered a letter to President McCabe on his first day of sick leave, ate dinner with a friend and visited with a former faculty member do not establish that respondent abused his authorized sick leave or engaged in gross insubordination.

Thus, the remaining issue is whether respondent's refusal to speak with two top-level administrators on two separate occasions constitutes "gross insubordination" for which dismissal is justified. That term is not defined by statute or by the rules applicable to community colleges. Whether one utilizes a dictionary definition or the rules applicable to district school boards, it is concluded that respondent's conduct occurring on February 20, 1985, constituted gross insubordination for which dismissal is authorized. As noted in the case of *Muldrow v. Board of Public Instruction of Duval County*, 189 So.2d 414 (Fla. 1st DCA 1966), the word "insubordinate" means:

> . . . a disobedience of orders, infraction of rules, or a generally disaffected attitude toward authority. It is generally synonymous with contumacious, which indicates persistent, willful or overt defiance of authority and obedience, sometimes contemptuous of authority.

The term "gross" is defined in the Merriam-Webster Third New International Dictionary as "immediately obvious, plain, evident," "glaringly noticeable" and "flagrant."

While respondent's conduct on February 19 toward Dr. Lukenbill, standing alone, may not have warranted a charge of gross insubordina-

tion, his conduct on February 20 does warrant such a charge. It appears that the events which occurred on the morning of the 19th were somewhat unusual and could have led to some confusion on respondent's part as to the nature of Dr. Lukenbill's request to speak with the respondent. However, there should and could have been no doubt in respondent's mind on the 20th that he was being directed to either communicate with his superiors or, to explain his reasons for failing to communicate. After being advised of the seriousness of his conduct, respondent's continued refusal to communicate demonstrated an evident and flagrant disobedience of orders and a willful defiance of authority. Obviously, a faculty member who refuses to speak to the administration when requested to do so is a detriment to the management and administration of the educational institution. Although given an ample opportunity to do so, respondent failed to offer any explanation for such behavior. His personal and unexpressed fears or concerns regarding his salary or rumors concerning other College personnel do not excuse his willful and continuous refusal to speak to and take direction from those administrators responsible for the operations of the College. See *Seitz v. Duval County School Board*, 346 So.2d 644 (Fla. 1st DCA 1977).

The rule applicable to district school boards define the term "gross insubordination" and may be consulted for guidance. Rule 6B-4.09(4), *Florida Administrative Code*, defines the term as "a constant or continuing intentional refusal to obey a direct order, reasonable in nature, and given by and with proper authority." Again, while respondent may legitimately not have perceived Dr. Lukenbill's invitation to talk as a direct order, there could and should have been no doubt as to the purpose of the February 20 meeting. Dr. Kelly's expressed concern and desire to discuss respondent's refusal to speak to the administration was in the nature of a direct order and was reasonable in nature. Respondent's refusal to discuss this reasonable direction or to otherwise explain his behavior to the Campus Vice-President and the Dean of Academic Affairs constitutes gross insubordination and grounds for dismissal.

## RECOMMENDATION

Based upon the findings of fact and conclusions of law recited herein, it is RECOMMENDED that respondent Joseph T. King be dismissed from employment retroactively to the date of his suspension for gross insubordination.

Respectfully submitted and entered this 20th day of December, 1985.